This is the time set for argument in the case of Sierra Club v. Trump. Mr. Byron, you may proceed. Nice to see you again. Thank you, Chief Judge Thomas. May it please the Court. Thomas Byron from the Department of Justice here on behalf of the government defendants. With me is Karen Hecker from the Department of Defense Office of General Counsel. This case is about an internal transfer of funds among DOD's accounts, and the internal transfer itself didn't harm plaintiffs. In fact, they don't contend otherwise. They contend that their interests were harmed by the subsequent downstream use of those funds for construction of border barriers and roads. But the transfer itself was authorized by a provision in the DOD Appropriations Act, and that provision was not designed to protect the kinds of interests that the plaintiffs here assert, the kinds of recreational, aesthetic, and environmental concerns that they've raised. The zone of interest requirement, which is a universal requirement, so whether they're seeking review under the APA or under an equitable ultra-virus claim, it applies in any event, and it asks this Court to determine whether those kinds of interests that the plaintiffs are asserting are aligned with the objectives of Congress's purpose in enacting the statute they rely on. Now, here, Section 8005 is intended to regulate the relationship between the Department of Defense and the Congress, the congressional committees, not the interests that the plaintiffs are asserting. The Supreme Court — So under your theory — Sorry, Your Honor. Under your theory, who would be in the zone of interest? Well, Judge Smith, in his dissent in the stay motions decision, articulated a view that perhaps those who would otherwise have been entitled to receive the funds could be within the zone of interest, and that makes some sense, Your Honor. We don't know the entire scope — But we don't know who those people would be because the funds were never expended, contracts were never let. True? And it may be, Your Honor, that in the case of a particular transfer, there might not be a plaintiff within the zone of interest. That's true in a variety of cases, but it doesn't — it's not a basis for relaxing the zone of interest requirement. I just want to emphasize that the Supreme Court's grant of a stay pending appeal was based, among other reasons, the Court said, on its concern about the cause of action that the plaintiffs are relying, this zone of interest concern. On the statutory cause of action brought by the Sierra Club. But I don't see that the plaintiffs here brought statutory causes of action against the government. The causes of action that they brought were for a violation of the Appropriations Act, ultra-virus, and it was the government that raised Sections 8005, 9002, and 284? 284, yes, Your Honor. 284 in defense. So the zone of interest test would apply to the causes of action that the plaintiffs actually brought, not to what the defense would be. So, Judge Wardlaw, I disagree with the characterization. I think if you look at, obviously, the briefs in this Court, the decision below, but also the complaints, that Section 8005 forms a central part of the plaintiffs' theory here. And let me take it a step back and just say that in all of the appropriations cause cases that have been discussed in the briefs and that the plaintiffs have relied on, the focus is always on the limitations in an appropriations statute. So in McIntosh, in Department of the Navy against FLRA, and in Harrington in the Fourth Circuit. Let me just turn to Department of the Navy in the D.C. Circuit, where then Judge Kavanaugh made clear that the way Congress expresses its authority under the appropriations cause is through appropriations statutes. And that's why the appropriate focus in all of those cases has been on the statutory terms, the limits that the plaintiffs rely on. That's the basis for their concern. They say that the Defense Department violated the limits in Section 8005, and that's why they say the appropriations cause is implicated. If the question were just have these funds been appropriated by law, of course they have. That's what the appropriations act is. Aren't you ignoring the role of the act that Congress did enact, which was for $1.375 billion in border fencing in Texas? That's what Congress appropriated. And the argument is that the government is acting in violating the appropriations clause by spending in excess of that amount and in other places along the Southwest boundary. So, Judge Wardlaw, let me take that in a couple of respects. First of all, the plaintiffs have argued, for example, that by approving some but not all of the separate request by a different agency, DHS, for funding for that agency's construction. How does DHS being a different agency make a difference in this case where the only reason DOD did the reprogramming was because DHS requested it? It makes a big difference, Judge Wardlaw, because Section 8005 speaks of an item and of military requirements and whether that is unforeseen, whether the item is unforeseen. And the language of the provision, I think it's 10 U.S.C. 2241, which reflects the same limitations but is not part of just each individual appropriations act but is part of Title X, uses similar terms. And the item in those contexts is an item in DOD's budget, not another agency's budget. The whole purpose of Section 8005 is to regulate that dynamic and ongoing relationship for budgeting. I understand the parties have a dispute about what the particular item is. What your characterization of the item is, what? The 284's counterdrug support by DOD. And that's the kind of thing that could have been included in DOD's budget request. And remember, DOD's Appropriation Act for FY19 was finalized in September of 2018, several months before, I think about five months before, the DHS appropriation was finalized. And so the question about whether it's unforeseen, what kind of item we're talking about, all has to be measured with respect to the DOD appropriations process, which was concluded in September of 2018. Can you clarify one factual issue for me? The motions panel said multiple times in its opinion that DOD was going to transfer the funds after they had been put into the counterdrug DOD account, was going to transfer the funds to DHS. Is that correct or is that wrong? No, Judge Collins, that's wrong. So the record explains, and I'll acknowledge it's a little bit tedious. It uses a lot of jargon. That's the nature of these budgeting and appropriations documents, but it makes clear that the transfer is within the DOD accounts. So DOD is going to be the one to actually spend the funds, build the wall? Yes, Judge Collins, that's right. Okay. And so let me just go back, Judge Wardlaw, to your question, because I think you were asking also, if I am understanding correctly, about whether the approval of a lower amount for DHS constituted some kind of decision. Congress's word on what it would spend for fencing along the southwest border. And I think the answer to that is twofold. One point I just made is that that's DHS, not DOD, but wholly apart from that. It's still the government. Fair enough, Your Honor. It's still the executive branch, right? So if the question is whether Congress, in that Consolidated Appropriations Act, by approving a smaller amount, a lower amount of appropriations than was requested, the GAO, the Government Accountability Office, which is the legislative branch's independent watchdog agency, expressly concluded and pointed out that it has reached similar conclusions many times in several decades. You're referring to your 28J letter? Yes, Your Honor, that's right. How much deference do we owe to the GAO? The Court has no deference, but, again, Judge Kavanaugh, in the Department of the Navy opinion, referred to that as an expert view, and the Court should give it appropriate consideration. And GAO is the expert agency with respect to appropriations law, and that's why all of those cases often refer to GAO opinions about appropriations questions. So GAO expressly said that the approval of a lower amount by Congress is not a denial and that transfers by several agencies, not just DOD under this authority, had been approved by GAO in the past where there had been a lower. Not just the denial of a greater amount. So it's fascinating to me how these briefs are written, how the case is written. One starts from almost pre-election with the president promising a border wall that's going to cost, you know, however billion, and Congress refusing to expend that money over and over to pay for that. Government shut down. Ultimately some compromise for some lesser amount for some smaller piece. And then you start with the item has to be specifically requested by DOD and specifically turned down by, it's almost like you're eliding each other. I don't think we're talking past each other, but I do think that the relevant consideration is the statutory tax, and Section 8005 does talk about those items denied by Congress that were unforeseen. Higher priority military. That's the basis for the district court's permanent injunction. It's the appropriate focus for the court here. Your view that an item is denied within the meaning of 8005 only if the line is zeroed out? So, Your Honor, I don't think that's the only way it could be denied, but I think this is an important point about why 8005 regulates the relationship between Congress and the Defense Department. It doesn't – we pointed out in our brief that there's a lot of evidence of the back and forth between the agency and the appropriations experts on the Hill. That's often reflected in the conference report, which we cited 600, I think 680-some pages, that goes through the back and forth, what was requested, what the House approved, what the Senate approved, what the conference committee finally decided. So there's all that back and forth, and that's the evidence of what Congress considered and denied, Your Honor. So if they, you know, didn't zero out a line, but they put in the conference report, we don't want it spent on this, you would say that that counts as a denial? That could well be, Judge Collins. And, again, you know, all of this, it's not clear whether that would be judicially enforceable in that context, and it's hard to imagine a situation, but certainly not by plaintiffs asserting the kinds of interests that these plaintiffs are alleging, where a court could sort of discern based on that back and forth. But that's the back and forth that Congress uses to determine whether an item was denied, whether this is an appropriate use of the transfer of authority. And that transfer of authority is, again, set by Congress. Let me go back, Judge Wardlaw, to your point about the Consolidated Appropriations Act enacted later. In that statute, Congress expressly included an authorization to use prior transfer authorities in addition to the transfer authorities in that bill itself. So Congress could have, if it sought to restrict the use of the transfer authority, could have in the Consolidated Appropriations Act prohibited that use for any particular purpose or altogether. Not only did it not do that, it expressly approved those uses. Judge Collins, just going back to this question about what's denied and what's not, again, the GAO has said that merely reducing an amount is not a denial. I'm not aware of any other opinions that the GAO may have issued about what might constitute a denial, but I think one thing we know is that here there's such an attenuation, different bill, different agency, different request, that it's not within, and GAO made this clear, it's not within the terms of the limitation in Section 8005. Getting back to the zone of interest, on this record, is there anyone you believe is within the zone of interest that could challenge the border wall funding? So, Your Honor, it's possible. Again, there are several. On this record? On this record. So the record does include the details about the programs from which the funds were taken, and a very large bulk of the funds were from excess retirement estimates that turned out not to be needed because military personnel weren't using the different benefit that was offered to them. So those estimates turned out to be excessive. Some of the other programs, though, may have included, for example, a contractor who expected to be granted a contract to build a, I don't recall. Many of the states, independently of California and New Mexico, raise similar issues. They say we have substantial military contracting in our state that would be effective. Why isn't that sufficient on the lowest standard of the zone of interest to satisfy the requirement? Chief Judge Thomas, on this record, again, the plaintiffs here are not asserting that any contractor in their state would have been entitled to funds from a transferor account. So I don't think they've alleged those kinds of interests here. Your question is whether it's possible that somebody might, in theory, be within the zone of interest. I don't know the answer to that, but, again, whether somebody is able to challenge in a particular case is not the appropriate measure. Somebody owned a home that was a ranch right on the border, and in connection, after the funds are reprogrammed, they come with a wrecking ball to tear it down. Of course, they're going to compensate him for it, but they come with a wrecking ball. Does he have a cause of action to say, wait a minute, the reprogramming was illegal? Judge Collins, that sounds a little bit like Patchak, which I expect is your point. And the Supreme Court there said that uses of the land, at least with respect to that statute at issue in that case, could be within the zone of interest. But that's because the purpose of the statute that authorized acquisition of land for uses by Indian tribes in that case expressly considered the uses. It was designed to encourage economic benefits for the tribes themselves. And so Congress identified that purpose. Here, the downstream use for construction or demolition or whatever it might be is not the purpose of the transfer authority. So the homeowner in that case, like these plaintiffs here, might have a claim about the statute authorizing that later use here, 284. We can talk about 284. That expressly authorizes the conduct, the construction at issue here. But that's not what the district court found. And the purpose of the transfer statute just has nothing to do with the later use, which could be really anything within military requirements. That person still would have no cause of action in your view. I think that's right, Your Honor, at least with respect to enforcing the limits in Section 8005. There would be ample remedies for challenging it on other grounds. But I think if what we're talking about is just 8005, the transfer, the internal transfer authority, that's what the zone of interest needs to focus on here. Do you have a case that would indicate that, like in this case, 8005 is essentially, in my view, affirmative defense, but that is subject to a zone of interest requirement as opposed to a statute where there's an implied cause of action or a direct cause of action? Chief Judge Thomas, I think I would have to take issue first with this sort of affirmative defense formulation. And I would say then that because we haven't conceived of this as an affirmative defense, I haven't, frankly, looked for cases that frame it that way. But one of the reasons I think we know, looking at, for example, I think Clark says this, the gravamen of the complaint and the limitations of the statute or the constitutional provision sought to be enforced is the proper focus of the zone of interest inquiry. Based on that focus, the limitation here is not the Constitution's appropriations clause by itself. Because as I said to Judge Wardlaw earlier, these funds were appropriated by Congress in the Defense Department FY19 Appropriations Act. The only question is whether the internal transfer authority has been complied with. I would like to reserve some time for rebuttal, Your Honor, and I appreciate the Court's questions. If there are no further, I'd like to reserve the remainder. Thank you. Of course. Thank you, Your Honor. We're from the Sierra Club. Thank you, Your Honors. Good morning. Troy Ledeen for Plaintiffs at Police, Sierra Club, and the Southern Border Communities Coalition. And with me is Noor Zafar. I think you've been here through about the entire litigation, if that's right. So welcome back. Thank you, Your Honor. I think I'd like to devote my time to three questions and then obviously answer whatever else the Court is interested in. I'd like to explain why the motions panel got it right. I'd like to ask this Court to, in addition, reach the Section 284 issue that was alluded to in some of the questioning. And finally, I'd just like to emphasize the urgency of action at this stage. So, first of all, we don't think, given the manifest correctness of the motion panel's decision, we don't think you need to go beyond the second layer decision because you can find that whether or not it's binding on this Court. The motions panel was correct. It was persuasive. It had us hear an argument. It had supplemental briefing. It issued a published decision. And whether or not it's binding, I believe the Court should adopt its conclusions. In particular, the conclusion that has been the subject of some of this back and forth about whether the government is invoking Section 8005 as an affirmative defense or whether, in fact, we are bringing claims under Section 8005. I think it might help to clarify, Judge Wardley, you were talking a little bit about the timeline in the different briefs. We filed this complaint on February 19th, which was the first business day after the President signed the Consolidated Appropriations Act, and also on February 15th was the day that the White House issued an official announcement saying that they were taking the $1.375 billion that Congress had given them after this very lengthy government shutdown but would nonetheless be building a border wall for $8.1 billion. And that's at SCR 186. That White House announcement on February 15th doesn't include at all Section 8005. And there's a good reason for it. They weren't trumpeting the fact that they were going to be raiding military personnel and pension funds for the wall. We also did not know that that was their intention. And when we sued, we raised claims under the Appropriations Act because what they had announced was an intention to disregard Congress's appropriations judgment as well as under the Consolidated Appropriations Act. We did not assert a private right of action under 8005, nor did we even know that 8005 was going to be triggered. We later amended the complaint once they invoked 8005, which was in March and again in May, and we added reasons why that was not a lawful defense for their spending. But we never suggested that Section 8005 conferred a private right of action. And I do think that the motions panel got it exactly right in saying these are claims under the Appropriations Act. They turn, as many Appropriations Act claims must, on issues of statutory interpretation because that is how Congress exercises its appropriations judgment. But that does not convert every appropriations issue, which is fundamentally a separation of powers issue, into just a rote statutory claim. If we were to disagree with any of the motions panel's conclusions, is it your position that under Laird we lack the authority to do so? Your Honor, our position is yes, that Laird states that a published motions panel decision is as binding as any other panel decision. Did Laird address the applicability of the law of the case doctrine and how that applies when a court remains seized of a case and can reconsider and change its decisions in the courts? Did it discuss that doctrine at all with the cases that discuss it? My understanding is that Laird was focusing instead on law of the circuit, which as I understand it is sort of a more binding rule than law of the case. So while law of the case can change over the course of the case, if it turns out that facts have changed or there is, I think, a manifest error might also erode law of the case, law of the circuit is simply not subject to those limitations. So I believe Laird was focusing on law of the circuit. When you made this comment that the day after the President signed the CAA that he announced an intent to build an $8 billion, was that confined, the monies that they were going to use to do that, was that confined to monies appropriated to the DOD or the DHS or any way? So the 8.1 is a combination of the 1.375 that Congress gave. Around 6, I think it's around 6.2 maybe coming from the Department of Defense, out of which we have $2.5 billion at issue in this appeal. And next week, I don't know who will be with me at that argument, but we'll be back in the district court on the remaining $3.5 billion that is under the national emergency. And then in addition, there's a small source of, relative to this case, $600 million taken from the Treasury forfeiture fund. But where did the funds come from for the national emergency? Is that also DOD? Yes, sorry, that's also DOD. So that's another $3.5 billion that's not at issue today. I'm not sure that what you've said about the law of the case is correct because we held in the Hauser case, we will reconsider a ruling of this court on the same issue presented in the same action if a showing is made which compels us to reconsider our prior decision. And we said that with respect to a prior motions panel decision. And we said where we have published a decision setting forth the reasons which guided us in resolving a legal issue in a certain way, we can more readily determine whether a proper showing has been made. So Laird didn't address the law of the case doctrine and the ability when a court remains seized of a case to reexamine the rulings. It talks about, yes, published authority is generally binding, but it didn't address this issue as I read it. Your Honor, I'm not contending that Laird addressed law of the case. And if I said that, I misspoke and I apologize. Laird, I believe, speaks only to law of the circuit. My contention is that once you have law of the circuit, whether it was created by a motions panel or by a merits panel, it remains law of the circuit and must meet the Miller v. Gamme test rather than the law of the case test in order to be undone. But I also want to stress, Your Honor, we're not asking you to make that ruling here. Because we do think that there's ample enough reason to follow the motions panel. And in addition, I just want to add a little bit over and above what the motions panel found. So one thing is if you disagree and you further disagree with the motions panel that this case is arising under the Appropriations Act or the court's equitable powers and you agree with the government that there needs to be a zone of interest showing under Section 8005 before the government's actions under Section 8005 may be checked, I want to commend to this case the D.C. Circuit's very thorough opinion in scheduled airlines in which they were also faced with a statute that Congress enacted back in 1849 specifically to govern the appropriations relationship between the executive branch and Congress. It was also a case against the Department of Defense. And there the government said, as it does here, well, private plaintiffs can't really enforce that. And the D.C. Circuit found it's certainly true that the private plaintiffs in that case were not regulated by the statute and that it was not enacted for their benefit. It was for the benefit of the public fisc and for Congress's appropriations control. Nonetheless, what matters is the congruence of the interest between the challenger and Congress. And there was no question that the plaintiff was a suitable challenger because it was seeking to accomplish exactly what Congress was trying to accomplish, which is enforce the restrictions on the executive misusing appropriated funds. Here, too, there's no meaningful way in which our interests can diverge from Congress. But further, as your questioning has shown, no one else can come into this court who the government would agree is within the zone of interest and enforce the government moving a billion dollars out of military retirement money. There's simply no one who can do that. So if the government is correct, there's just a billion-dollar slush fund lying around in DOD for the government to use as they please. May I ask a clarifying question? The motions panel spent a great deal of time discussing authority under the Administrative Procedures Act. But as I read your First Amendment complaint, you are not raising that claim. Is that true? Your Honor, we don't think this case is best thought of as an APA case. We think it's best thought of as a non-statutory ultra vires action. My question is, did you plead that? We did not plead it as an APA claim. Now, this court has said it's we certainly put in our stay briefing. I believe it's in our briefing here, too. This court has said numerous times that there's no specific preclusive meaning to that. The panel and the Supreme Court in Japanese whaling said the same. The panel can take and the Supreme Court can take a complaint that did not plead an APA claim and construe it as an APA claim. So certainly that's within your power if you think it is an APA claim. We do think that a non-statutory ultra vires action is the way historically courts look at examples of the executive acting without any authority. Is it your view that a non-statutory ultra vires claim, that the standing goes to the outer limit of Article III, that there's no, I know we don't call it prudential standing anymore, but that there's no prudential limits on the standing? Yes, Your Honor, but I think the reason that that is the case is because ultra vires actions are rare actions in which an executive officer takes an action without any legal authority, and so dating back to England, courts of equity have been available to enforce that. I think a prudential restriction, first of all, the court in Lexmark has already started, you know, disapproving of those, but they do really speak to, in Lexmark, to the court's unflagging need to address cases that are properly before it, and nothing is more properly, we believe, before Article III courts than separate core separation of powers issues that implicate private citizens. I mean, they've always been able to call upon the courts for that. So, yes, I don't think there's an additional limit. Your Honor, if I may just say one thing about urgency, please. Ever since the Supreme Court stayed this action, or stayed the injunction in this action, the government has moved very quickly to spend the money and begin building. As we speak, there are sections of wall going up in Organ Pipe, which has up until now been a highly protected national monument. There's huge amounts of water being drawn because they're putting the wall with a great deal of cement, and there's bulldozers and really heart-wrenching pictures from the border that are being sent to me every day. So I would just ask this court to please move as expeditiously as it can. Thank you very much. Thank you, counsel. Here from the state. Good morning, and may it please the court. James Zaretka with the California Department of Justice on behalf of the states. You heard counsel for the federal government talk about recreational, environmental, and aesthetic interests. Those are the interests that the organizational plaintiffs assert, well-recognized as legitimate. What they fail to mention repeatedly in their briefs and here today are the states' interests, and there's an important distinct interest unique to the states, our sovereign interest in enforcing our laws, which defendants' conduct have wiped out. We have laws to enforce the Clean Water Act and the Clean Air Act, which Congress has specifically said apply to federal construction projects, and through their series of actions, it's really one set of actions that should be looked at together, their divert, waive, and build scheme, the defendants have wiped those out. The states are impeded, prevented from enforcing their laws. This is an interest that was not before the state panel, not before the Supreme Court, and defendants consistently ignore it. In fact, they cite the same case that we do that this is irreparable harm. When a government is prevented from enforcing its laws, this is the Maryland v. King case, Justice Roberts, that is irreparable harm. They cite the same case, far from contesting it. The only argument they make is an argument about traceability, which is an Article III argument, and they don't contest Article III standing. So this issue needs to be addressed by this court, the states' particular harms. As far as the constitutional claims go, they urge you to look at the complaint, and I would do the same. You'll see in our complaint, our first two claims are constitutional violations. That's the heart of this case. Whether or not this 8005 statute is complied with or not, their actions are unconstitutional. Judge Wardlaw went through the actions that preceded the government shutdown. We have a clear denial. We have a clear refusal by Congress to fund border barriers beyond $1.375 billion in the Rio Grande Valley. Could not be clearer. How do you define the item? Your Honor, that is relevant to the 8005 statutory claim. It's not relevant to the Appropriations Clause claim, which is the heart of this case. The item, but I would say for the statutory claim. If the claim, their authorization to spend the money or to move the money and then spend it is 8005, then we have to look at what counts as an item under 8005. What are the criteria? What's the test for determining what counts as the relevant item? So I'll say, just address that, but also say that whether or not they comply with Section 8005 has no bearing on our constitutional claims because they flew in the face, their actions flew in the face of Congress's repeatedly expressed will, and they can't do that under Youngstown, and they also made a different policy choice, which was written by the City of New York. So even if 8005 allows them to transfer the money, it's your view that there is a constitutional violation with doing so based on what? If the statute says they can move the money, what prevents them from moving the money? The Constitution, Your Honor. Explain that. Of course. So if 8005 were to be construed to allow this unconstitutional act, it would be unconstitutional as applied. In the face of this consistent congressional refusal to appropriate funds beyond the $1.375 billion, we have multiple failed legislation, we have a whole shutdown over it, we have the administration coming again and again, give us more, give us more. Congress said no. If they can then go ahead and move money for more border barriers in the face of all that opposition based on 8005, that's unconstitutional. In violation of the Appropriations Clause? In violation of the Separation of Powers Doctrine, which manifests itself in various ways, the Presentment Clause, the Appropriations Clause, yes, Your Honor. So if an appropriations statute gives them authority to spend money, they still can't spend it? If there was another debate about a different set of money, then we should read that as barring the express authorization in the other statute? Well, I think this gets back to your question about the item. And the relevant item here, whether you use a statutory term or just more generally what was at issue, is border barrier funding. It was very clear the government shut down over that. We have a very robust record of congressional refusal on that point. And we have the administration consciously deciding to go against that. The day after the President signed the Consolidated Appropriations Act with $1.375 billion in it, he says I'm adding $6.1 billion more. And that is right in the face, and the City of New York case is very clear on this, that the President cannot countermand Congress's policy choice in that way. And so, yes, Your Honor, if this statute were to be interpreted to allow what they were doing, its unconstitutional as applied. We don't think it should be construed that way. And we do think that the item for statutory purposes, getting back to your question, was the border wall. That's a common-sense interpretation. That's the common usage of the word item. This idea that it's some specific budget line item, as I think the State panel properly said, could really offer some gainsmanship on their point. And so we're talking about the border wall. That's what Congress refused to fund. That's what the President went ahead and transferred money for. I'd like to speak briefly to the GAO report and just to say correctly that the panel has mentioned that there is no actual deference due to their view and also say it doesn't speak at all to the constitutional issues. It only speaks to that statutory issue. That's really what they have to have any expertise in. That's what it is. And I'll also say that they really flipped the intent of this 8005 statute completely on its head. They say that it was meant to give DOD more flexibility when the exact opposite is true. Congress went ahead and enacted 8005 because they were perceiving correctly in some cases that DOD was putting funds towards uses that Congress had already said no to. So they really just get it, frankly, quite wrong on that point. I'd like to also speak to this issue of the zone of interest. And I think, Judge Collins, you're hypothetical. And their response really shows the breadth of their argument here, which is that really nobody can challenge the act they're taking here. And so I would just say that the Pachock case makes very clear that we look to the ultimate use. So it's not they try to they really want to make this about this very technical intergovernmental transfer. But what Pachock says is when we look at zone of interest, it's about the ultimate use. No question here the ultimate use of these funds was to build border barriers. And so our interests, the state's interests, are intertwined with the entire process. This is the phrasing of Pachock, that there it was, the statute about land acquisition, was directly tied to the ultimate use. Likewise here, what they did with 8005 is ultimately directly tied to their use of the fund, which is to build border barriers. And the states have a profound interest in that, particularly given the fact that our laws were waived through OIRA. That was what causes irreparable harm to the states. Again, they don't even contest that our inability to enforce our laws is irreparable harm. And Congress has said that our state environmental standards apply to federal construction projects. So there isn't even a credible argument that there's some sort of federal preemption here, which they allude to briefly. So I think when we look at Pachock, that shows that we are in the zone of interest, even of the statutory claims. And their argument is breathtaking, I would say, in its breadth. It would wipe everyone out from being able to challenge these types of actions. Do you think the zone of interest requirements apply to the appropriations claims, constitutional claims? We don't, Your Honor. Lexmark speaks very specifically about statutes, legislative intent, congressional intent. Is Lexmark the latest Supreme Court decision describing what the zone of interest test is? I would say that I'm sure that they've addressed it since, but it certainly sets up the current standard, yes, Your Honor. All right. You would agree a zone of interest test applies to your APA claims? Yes, Your Honor. It's been consistently applied. And I'll speak just a little more on the constitutional claims. And the reason that this test is so broad is that every stakeholder in our democracy has an interest in ensuring that these structural provisions are enforced. So to lay over some sort of artificial zone of interest test would make those pillars of the Constitution unenforceable because no one could come into court, as you just heard this morning, no one could come into court to challenge them. And, you know, Justice Kennedy was very clear on this in the Bond case where he said that, basically along the lines I just said, any person can come in who's harmed in an Article 3 sense, which, by the way, that's not a check-the-box exercise. We know that people with generalized grievances, a typical taxpayer, could not come in and challenge it. They would have to have all of the Lujan factors, which is that's a test Justice Kennedy specifically alluded to in Bond to say, if you meet the Lujan Article 3 factors, the fact that these constitutional provisions are meant to preserve liberty for all means that you can come in and challenge. But didn't Bond also refer to prudential? And, again, we don't call them prudential again today after Lexmark. But didn't it also refer to the prudential doctrines as well as being relevant? It did, Your Honor. And that is exactly the same part of the discussion where Justice Kennedy mentions Lujan. So what he's saying there I think is quite clear, that due to the structural nature of these provisions, the importance of every stakeholder in our democracy being able to come in and challenge actions to undermine it, as long as they meet Lujan. He was very clear about that. But Lujan only talks about Article 3 standing. It doesn't talk about the prudential ones. And the relevant one here, zone of interest is a prudential doctrine, Lexmark, recasts it, but it would traditionally, and at the time of Bond, been understood as a prudential doctrine. So why doesn't Bond suggest that it does apply? Because Justice Kennedy discussed that after he talked about Article 3 standing. So in that case, the criminal defendants had Article 3 standing. But then he went on to say, and, you know, we do have prudential concerns, but those are met here, and he referred back to Lujan. So his view is quite clear to me, that his view is, as long as you have Article 3 standing, because of the nature of these constitutional provisions, you are able to come in and assert them. There's no additional zone of interest test layered over that. And this Court also endorsed that view of McIntosh in the specific context of the Appropriations Clause, I might add. It cited a lot of Justice Kennedy's language from Bond, including a string cite, with multiple cases where this has been the case, where the City of New York, Chadha, other cases were in there, and endorsed this idea in the specific context of the Appropriations Clause. Did not look to the appropriation itself and say, here's the statute, as defendants want you to do. Just look at the statute and what that's trying to protect. It took a very broad view, just like Justice Kennedy did in Bond. So we think that's appropriate here as well. Thank you, counsel. Thank you. Mr. Letter, nice to see you again. Welcome back. Different capacity. Thank you very much, Your Honor. Move tables. It is sort of odd here. Mr. Byron and I worked together for about 25 years at the Justice Department, and now here I am. In fact, I worked closely with Judge Collins a batch of times at the Justice Department, but I'm now representing the House of Representatives, Your Honor, and in this case, on the right side. So I just have several points. I did want to start by saying we, the House of Representatives, the Speaker of the Court, in allowing us to be heard here. Thank you. A couple of things. I think that this case is best summed up by a statement by the Acting Chief of Staff, the President's right-hand man, Mr. Mulvaney. He said, we're going to build the wall with or without Congress, and that's what this is about. You can't build a wall without Congress, as we know. That's what the Appropriations Clause says. It's absolutely clear. We relied on then Judge Kavanaugh's opinion. I think he says something like an agency can't buy a stick of wood without appropriations from Congress. As to the specifics, I did want to address a batch of questions that Your Honors asked. Judge Collins, you said, what's the item? If I may refer you to pages 21 and 22 of our amicus brief, the administration answered that question. Down the bottom of page 21, the Acting Secretary of Defense, his memorandum with the first transfer of funds, he said that the items to be funded are, and I'm quoting, Yuma Section Projects 1 and 2 and El Paso Project 1. So the Secretary of Defense knew what the items were, and the items are extensive construction of a southern border wall. If you look at the statute, it says in the proviso, it said, in no case were the item for which funds are requested. That suggests that you're looking at where the funds are going within DOD, doesn't it? I don't think so, Your Honor. I thought, to my mind, a common sense reading here is the funds that are requested. President Trump said, requested, very clearly requested, said, I want to build a border wall and I want a whole lot of money to do that. And Congress, remember, not just the House, Congress said, absolutely not. So I think, Your Honor, that, again, a common sense reading against the backdrop of, as my learned co-counsel said, remember that Section 8005, from which you're quoting, was meant by Congress as a restriction on the ability of the executive branch to reprogram and transfer money. And so under those circumstances, when it was absolutely clear to everybody that we're talking about a border wall, and indeed, Your Honor, why would the administration have shut down the government for several, for a long period, as it did, if it knew all of this is just theater because we can and will move the money from DOD? That can't possibly be what was meant. It's just impossible to believe that Congress decided to provide a statute whereby the President can be denied so publicly and specifically in a way where Congress said, ultimately said, we'll give you a certain amount of money, but we don't think what you want the money for is not a good use of the taxpayers' funds. Absolutely clear there. If I may, I just wanted to add also one item on the GAO report and the expert nature of the GAO. I think, I hope that this court, I'd like to express outrage for you, notice that the GAO opinion never even mentions, not even mentions, the determination by Judge Gilliam and this court about the legal issues here. I'm just astonished that a federal agency would purport to describe the meaning of a statutory provision not even mentioning recent decisions by judges. The zone of interest test, I think what we would like the court to do, and again we cited in our brief, is I believe that Judge Bork provided a very good discussion in the Bracey decision, and I think the court, it's a quite persuasive decision that still holds. I urge the court to look at Judge Bork's words there. Oh, and the one other thing is, again, my friend Mr. Byron, who by the way is a phenomenal oral advocate, I believe what I heard the answer to, I think it was Chief Judge Thomas' question, was no, as a practical matter, nobody can sue. The appropriations clause can be violated at will by the president in such a major and public way, and there really is nothing that the courts are going to be able to do about it because we, the Justice Department, are going to oppose anybody coming into court to try to enforce this absolutely central part of the U.S. Constitution with roots going back hundreds of years into British history about the importance of the power of the purse being exercised by the representatives of the people. The court has no other questions. Thank you. Thank you. Thank you. Just a few points in rebuttal, if I may. First of all, on the zone of interest, just take issue with Mr. Leder's characterization of our position. We're not saying, and we've made very clear in our briefing as well, we're not saying that there could never be a plaintiff who could be within the zone of interest of either this restriction or any of numerous other restrictions in appropriations acts. I want to go, though, to Judge Collins, your question about the plaintiff's characterization of their claim as one that does not rest in some way on Section 8005 because I don't think it's fair or accurate in light of the way the claims have actually been addressed in this case and the way they were presented to the district court and to this court. The idea that Congress silently, merely by enacting an appropriation statute for DHS with a lower amount of funding for that agency than was requested, somehow implicitly acted to prohibit the use of a statutory transfer authority that is in DOD's own appropriation statute and that the Consolidated Appropriations Act itself expressly preserves, it boggles the mind. This idea that Congress can somehow impliedly act in a way that contradicts its expressed statutory terms does not make any sense, and it's certainly not confirmed by any of the appropriations cases that we've looked at. And, Judge Thomas, I want to go back to your question about whether this could be fairly characterized as an affirmative defense. If the plaintiff's claim is just period, there has been no appropriation, then the defense isn't, you know, we've complied with the terms of 8005. The defense is, yes, there was an appropriation. The funds were appropriated in the DOD FY19 Appropriations Act. Then the plaintiff's counter is, obviously, we didn't comply with the terms limiting the transfer authority. You know, we're pretty far down the line at that point, but that's really where the rubber meets the road. That's the plaintiff's gravamen of the plaintiff's complaint. It's the statute whose terms they seek to enforce, and it's those limitations that are at issue here, and it's those limitations that are the appropriate focus of the zone of interest inquiry. That zone of interest inquiry, going back, Judge Collins, to your questions to opposing counsel about how that plays out in different contexts, and, Chief Judge Thomas, I think you asked as well about an inequitable ultra-virus claim, how the zone of interest's requirement should be understood. We think that Lexmark properly understood did not abrogate the Supreme Court's earlier clear statements in Clark, in Valley Forge Christian College, and in pretty much every case that talks about the zone of interest, that the zone of interest requirement is a universal one, that Congress may, in some circumstances, expand the zone of interest, perhaps, theoretically, maybe even to all plaintiffs with an Article III injury, although Thompson against North American Stainless suggests that that might not actually be right, and the only case where the Supreme Court has said that expressly is in the Fair Housing Act context in Title VIII, and even in Title VII, which has a person-aggrieved standard, much like the APA, Thompson makes clear that not everybody can sue. The hypothetical there, this is really critical, is that a shareholder couldn't sue, even though the shareholder has Article III injury from the diminution of the stock price, merely based on a discriminatory firing of, say, the CEO, which causes the share price to decline. That shareholder's not within the zone of interest of Title VII. Similarly here, the zone of interest of Section 8005, the transfer statute, wholly apart from Section 284, has to do with the relationship between Congress and the Pentagon, and that transfer statute, like others that the GAO referred to, is designed to ensure flexibility because Congress does want to make sure that the needs of the military can be met, even as they change after the enactment of the Appropriations Act for any particular fiscal year. But your position in this case, or in other cases, is that Congress has no standing and is not within the zone of interest, correct? So, Your Honor, Congress has not sued in this case. In other cases where the House of Representatives has sued or where individual legislators have sued, questions of legislative standing have been addressed and must be resolved, and those are serious. Those Article III concerns are related to the Article III concerns in other contexts, but that doesn't mean the fact that Congress can't come to court doesn't mean Congress can't enforce its mandate. It does so all the time, both in the ongoing appropriations process, and the GAO referred to this, and also in the enactment of statutes. I guess I understood from your briefing that almost that precise point, that in response to who can sue, that litigation, from what I read in your brief, that litigation is not the proper response, that the proper response is a political response by legislative enactments by the House or whatever. So, Judge Whittle, I think I was just trying to explain that that is the ordinary way Congress enforces its concerns about this budgeting process and the flexibility it's afforded. We're not, however, saying that it's the only way, and I've tried to make that clear, that there could be a potential plaintiff in an appropriate case who could sue, and we've never said otherwise. We've tried to make very clear that we are not taking that categorical position here. This zone of interest inquiry really is about the interest that these plaintiffs have raised, and the idea that they can evade the zone of interest requirement that would be required when Congress enacts an affirmative express right of action, such as in the APA itself, merely by saying, well, we're not relying on that express cause of action. We're relying on an implied cause of action, whether under the appropriations clause of the Constitution or under some equitable ultra viris theory. That would undermine the principle of the zone of interest requirement, as Thompson against North American Steel made very clear, and indeed as Lexmark did, too. If an implied right of action is broader than an express one, that doesn't make any sense from a separation of powers perspective. I see my time's almost expired. If the Court has any further questions, I'd be happy to answer them. Otherwise, we'd ask you to reverse and vacate the decisions below. Thank you, Your Honor. Thank you, counsel. Thank all of you for your arguments today and your briefing. It was very helpful to the Court, and we'll be in recess.
judges: Thomas, Wardlaw, Collins